***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Jones and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award, except for modifications regarding the period of disability, defendants' entitlement to a credit and other minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement as
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. Legion Insurance Company was the carrier on risk and Cameron Harris was the servicing agent.
4. Plaintiff's medical records were stipulated into evidence as portions of Stipulated Exhibit 1.
5. Industrial Commission Forms and filings relating to this case were stipulated into evidence as portions of Stipulated Exhibit 1.
6. A videotape of Carolina Defense vs. Minnesota Offense for August 22, 1998 was stipulated into evidence as Stipulated Exhibit 1A.
7. The issues before the undersigned are: (i) whether plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer on August 22, 1998; (ii) if so, what compensation, if any, is due plaintiff; (iii) to what credits may defendants be entitled; (iv) what is plaintiff's correct average weekly wage; and (v) what recovery are defendants entitled as a result of plaintiff's workers' compensation against the Chicago Bears?
 *********** EVIDENTIARY RULINGS
The objections raised in the depositions of Richard A. Berthelsen, Dennis Curran and Marty Hurney, are OVERRULED.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was thirty-six years old and was living in Chicago, Illinois. Plaintiff received his undergraduate degree at Clemson University with a major in Industrial Education. Plaintiff played football at Clemson University on a scholarship. While at Clemson, plaintiff was an All American and finalist for the Thrope Award given to the nation's premier defensive back.
2. Plaintiff was drafted by the Chicago Bears to play professional football after college. Plaintiff was selected by Chicago Bears in the first round of the draft and was the eleventh pick. Plaintiff played for the Chicago Bears for eight years and was voted to the Pro Bowl and made the All-Madden team.
3. After leaving the Chicago Bears, plaintiff played for the Pittsburgh Steelers as an unrestricted free agent. During this time, plaintiff started in twelve of the games played by the Pittsburgh Steelers.
4. On July 25, 1998, plaintiff entered into a professional football contract with the Carolina Panthers. The contract was for the period from July 25, 1998 through February 28, 1999 and the terms indicated plaintiff was to be paid a salary of $325,000.00. The contract further indicated in the event plaintiff was injured in the performance of the services under the contract and could not play any professional football, he would be paid a salary of $325,000.00 over the course of the season of the injury regardless whether plaintiff made the roster or not.
5. Plaintiff reported to the Panthers training camp on July 26, 1998 and underwent a physical examination with the team physician, Donald F. D'Alessandro, M.D. Plaintiff indicated a previous right knee injury for which he had undergone a right knee scope in 1995. Plaintiff had fully recovered from this injury and had returned to play professional football for the Chicago Bears.
6. On August 22, 1998, during the third game of the pre-season, plaintiff injured his right knee when he was hit unexpectedly or blind-sided by a receiver from the opposing team. Plaintiff was completely caught off guard by the hit and plaintiff's right knee was torqued or twisted in an unusual way as he fell to the ground.
7. Plaintiff immediately recognized there was something wrong with his knee when he got up to play. However, plaintiff's adrenaline levels caused him to keep playing for one more play.
8. Plaintiff limped off the field to the sideline after the next play and was unable to return to the game due to the deterioration of his knee.
9. On August 23, 1998, plaintiff underwent medical treatment by the team physician with included galvanic/high voltage treatment and prescription medication. Plaintiff was not released to play football at this time. Plaintiff continued to be treated by the football team physician for the next two days.
10. On August 25, 1998, plaintiff was notified by defendant-employer his contract to play football with the Carolina Panthers was being terminated. Plaintiff understood he was being terminated because his skill or performance was not satisfactory as compared to other players competing for positions on the team roster.
11. On August 27, 1998, plaintiff was examined by the team doctor and diagnosed with a right knee medial collateral ligament sprain and treated with a cold pack.
12. Head Coach Dom Capers told plaintiff that he would have made the active roster had he not injured his knee during the third pre-season game.
13. Plaintiff's contract to play football with Carolina Panthers was terminated on August 25, 1998, which was one day before plaintiff was offered the opportunity to be examined by the team physician. It was also one day before plaintiff signed the physical waiver form.
14. On September 17, 1998, plaintiff returned to Chicago and was evaluated by Mitchell Sheinkop, M.D., for right knee pain. Dr. Sheinkop indicated plaintiff had been injured in a pre-season football game two weeks prior to the evaluation. Dr. Sheinkop suspected a tear in the medial meniscus and possible osteochondral fracture.
15. Plaintiff underwent an MRI of the right knee on September 17, 1998 which indicated plaintiff suffered an osteochondral fracture of the medial femoral condyl, a low to mid grade tear of the medial collateral ligament and a possible tear of the posterior third of the medial meniscus.
16. On September 23, 1998, plaintiff was examined by Sanford Kunkel, M.D., a member of the injury grievance panel of neutral orthopaedic surgeons who examine professional football players. Dr. Kunkel determined plaintiff had twisted his knee while playing for the Carolina Panthers on August 22, 1998. Dr. Kunkel also indicated plaintiff had suffered a persistent medial pain in his right knee since the day of the injuries but the team doctors had failed to order an x-ray or an MRI of plaintiff's right knee. Dr. Kunkel indicated plaintiff had been terminated by the Panthers while his knee was still injured and that plaintiff's meniscal pathology was responsible for his pain and supported Dr. Sheinkop's surgery recommendation.
17. On September 24, 1998, plaintiff underwent knee surgery by Dr. Sheinkop. Dr. Sheinkop noted that during surgery he had found both acute and chronic changes in plaintiff's knee. Dr. Sheinkop indicated the tear of the medial meniscus and the osteochondral injury in relation to the tear had prohibited him from being able to play professional football at that time.
18. Plaintiff began physical therapy for his right knee after his surgery. Plaintiff indicated his desire to return to professional football as soon as possible.
19. On November 10, 1998, plaintiff's physical therapist indicated plaintiff was fully rehabilitated and discharged plaintiff from physical therapy.
20. After physical therapy, plaintiff continued to work out on his own in an effort to continue to improve his condition so that he could return to professional football.
21. In the spring of 1999, plaintiff traveled to New Orleans to try out for the New Orleans Saints. Plaintiff did not make the team.
22. In July 1999, plaintiff and defendant-employer entered into a settlement agreement whereby defendant-employer agreed to pay plaintiff a lump sum in the amount of $114,705.88 in exchange for plaintiff's promise to release defendant-employer from all liability relating to the injury grievance that plaintiff had filed on September 18, 1998. The injury grievance was filed on the grounds at the time that his contract was terminated plaintiff had not sufficiently healed from his August 22, 1998 right knee injury. Plaintiff was unable to perform the services required by him by the NFL Player Contract.
23. Plaintiff returned to work as an events planner for Image Concepts in September 1999 through September 2001 earning $1,500.00 per month working 25 hours per week.
24. On November 1, 1999, plaintiff returned to Dr. Sheinkop with complaints of right knee pain. An MRI was ordered and indicated a large focus of abnormal signal seen within the distal medial femoral condyle.
25. On August 2, 2000, plaintiff was evaluated by Gordon Nuber, M.D., upon referral from Dr. Sheinkop. After the evaluation, Dr. Nuber indicated plaintiff had a trochlear groove erosion that he believed was probably down to the bone of the femoral condyle at the time. Dr. Nuber recommended plaintiff undergo right knee surgery.
26. On September 20, 2000, plaintiff underwent a right knee surgery by Dr. Nuber that included an arthroscopy, debridement of trochlear groove erosion, OATS osteochondral bone grafting and microfracture procedure.
27. Following the surgery, plaintiff continued to be treated by Dr. Nuber.
28. At the last office visit that occurred approximately one month prior to the date of the hearing before the deputy commissioner, Dr. Nuber instructed plaintiff to avoid activities that require heavy pounding of his right knee. Because of the nature of professional football, plaintiff was unable to return to playing professional football.
29. Plaintiff has not been able to play professional football since August 22, 1998.
30. Plaintiff has obtained other employment since August 22, 1998. Plaintiff returned to work as an events planner for Image Concepts in September 1999 through September 2001. Plaintiff began work for a sports marketing company in Chicago in or about April of 2001 and earned approximately $12,000.00 as result of that employment. Plaintiff has also received payment for appearances in signing autographs. Plaintiff has been paid $500.00 per appearance and does approximately two appearances per month.
31. Plaintiff had worked less than 52 weeks at the time of his compensable injury by accident. Due to the nature of professional football and how contracts are negotiated and paid, fair and just results cannot be obtained by calculating the average weekly wage based on the actual weeks plaintiff worked prior to his injury of August 22, 1998. No evidence has been presented of the average weekly wage of an employee of the same grade and character as plaintiff and in the same locality or community earned in the fifty-two weeks preceding plaintiff's injury by accident. The nature of the NFL players' contract creates exceptional reasons as to why it is not unfair to either plaintiff or defendants to use the future earnings covered by his contract as basis for calculating his average weekly wage. Plaintiff claims an average weekly wage based on what he would have earned but for his injury. Defendants claim they are due a credit for sums paid pursuant to the same contract under paragraph 10 after the date of plaintiff's compensable injury by accident.
32. Paragraph 9 of plaintiff's contract with defendants reads:
 INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will received such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the service required by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.
33. Paragraph 10 of plaintiff's contract with defendants reads:
 WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.
34. The NFL Management Council and the NFL Players' Association differ on their interpretation of paragraph 10 of the players' contract. Dennis Curran, senior vice-president of the NFL Management Council, testified that the settlement amount was paid out of defendants' gross revenues and therefore defendants are entitled to a credit. Mr. Curran interprets paragraph 10 to entitle defendants to a dollar-for-dollar offset for workers' compensation paid to plaintiff. Richard Berthelsen, general counsel for the NFL Players' Association, testified that since the settlement under the Injury Grievance was paid out of the players' share of gross revenues, defendants are not entitled to any credit for this payment. In the alternative Mr. Berthelsen interprets paragraph 10 not to entitle defendants to a dollar-for-dollar credit, but a credit for the number of weeks that a player is paid under paragraph 9. Mr. Berthelsen further testified that there is no requirement that a player make the team to be entitled to recover under paragraph 9.
35. The Full Commission finds that the Injury Grievance monies paid to plaintiff came from the gross revenue earned by the Panthers from professional football games. The gross revenue is put into a mathematical formula to determine the players' salary cap for each football season. Plaintiff did not contribute to the salary cap for the Panthers. The salary cap is an aggregate limit on what can be paid to the players. Individual players negotiate their own salaries, depending upon their skill and abilities. All the players' salaries and benefits on the team cannot exceed the limit mandated by the salary cap. Plaintiff was paid salary and benefits out of money that was designated as money that can be paid to players, but no percentage of his salary was put into the fund to pay for benefits. Therefore, defendants are entitled to a credit for the payment of $114,705.88 "made by the employer" pursuant to N.C. Gen. Stat. § 97-42.
36. N.C. Gen. Stat. § 97-42 provides in part that:
 Unless otherwise provided by the plan, when payments are made to an injured employee pursuant to an employer-funded salary continuation, disability or other income replacement plan, the deduction shall be calculated from payments made by the employers in each week during which compensation was due and payable without any carry-forward or carry back of credit for amounts paid in excess of the compensation rate in any given week. (emphasis added)
In the instant case, the sum of $114, 705.88 was paid to plaintiff in one week, which normally would mean defendants would only receive credit for $532.00, the amount of one week's compensation. However, paragraph 10 of plaintiff's contract provides that the credit shall be the amount of the payment made which is a method different than the method listed in the statute. Therefore, because the plan provides for a credit based upon the payment itself, pursuant to N.C. Gen. Stat. § 97-42 the credit is not based upon the number of weeks for which plaintiff was paid, but rather defendants are entitled to a credit for the $114,705.88 settlement paid to plaintiff on a dollar-for-dollar basis.
37. Plaintiff sustained a compensable injury by accident on August 22, 1998 arising out of and in the course of his employment with defendant-employer. Plaintiff's wages would entitle him to receive a weekly benefit for his temporary total disability of $532.00, the maximum compensation rate for the year of 1998 from August 22, 1998 until he returned to work September 1999, subject to the credit referenced above.
38. Plaintiff has proven that he could obtain work which was both suitable work for his condition and which was available in the marketplace, thereby establishing that he has some partial wage earning capacity. Based upon the foregoing, plaintiff was unable to earn the same or greater wages that he was earning at the time of his injury in the same or any other employment from August 22, 1998 through September 1999. As of this latter date plaintiff established that he had a partial wage earning capacity when he earned less than his pre-injury average weekly wage.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. On August 22, 1998, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer that resulted in significant right knee injuries. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff had worked less than 52 weeks at the time of his compensable injury by accident, therefore his average weekly wage cannot be calculated by use of the first or second methods provided in N.C. Gen. Stat. § 97-2(5). Due to the nature of professional football and how contracts are negotiated and paid, fair and just results cannot be obtained by calculating the average weekly wage based on the actual weeks plaintiff worked prior to his injury of August 22, 1998, the third method provided in N.C. Gen. Stat. § 97-2(5). No evidence has been presented of the average weekly wage of an employee of the same grade and character as plaintiff and in the same locality or community earned in the fifty two weeks preceding plaintiff's injury by accident therefore it is impossible to calculate plaintiff's average weekly wage according to the fourth method provided in N.C. Gen. Stat. § 97-2(5). Calculating plaintiff's average weekly wage by any of the foregoing methods would be unfair to the employee, therefore, exceptional reasons exist to use the method herein for calculating plaintiff's average weekly wage that most accurately approximates the amount which plaintiff would be earning were it not for the injury he sustained. N.C. Gen. Stat. § 97-2(5). Plaintiff's average weekly wage should be determined from the amount he would have earned if he had continued to play football for defendants. This is the approach previously applied by the Full Commission for professional football players, which was affirmed on appeal. Larramore v.Richardson Sports Limited Partners, 141 N.C. App. 250, 540 S.E.2d 768
(2000). Since plaintiff's salary was $325,000.00, his average weekly wageis $6,250.00.
3. As a result of his compensable injury by accident on August 22, 1998, plaintiff was temporarily totally disabled from August 22, 1998 through September 1999, during which time plaintiff is entitled to temporary total disability compensation at the rates of $532.00 per week of 1998, which is the maximum compensation rate for the year 1998. N.C. Gen. Stat. § 97-29.
4. Defendants are entitled to a dollar-for-dollar credit for the amounts paid to plaintiff from his injury grievance settlement pursuant to Paragraphs 9 and 10 of the contract between plaintiff and defendants and N.C. Gen. Stat. § 97-42 which allows for a dollar for dollar credit in its exception proviso. Therefore, defendants are entitled to a credit for the $114,705.88 plaintiff received as settlement for his grievance against defendant-employer. N.C. Gen. Stat. §§ 97-29; 97-42. Larramore v.Richardson Sports Limited Partners, 141 N.C.App. 250, 540 S.E.2d 768
(2000).
5. Due to his inability to earn the same wages in the same employment or other employment as a result of his compensable injury by accident of August 22, 1998, plaintiff is entitled to temporary partial disability compensation beginning in September 1999 based on two-thirds of the difference between plaintiff's average weekly wage before the injury,which was $6,250.00, and his average weekly wage earned subsequently while working at Image Concepts, as well as the $12,000.00 that he had received from the sports marketing company in Chicago and the $1,000.00 plaintiff receives on a monthly basis for appearances and signing autographs but not more than the maximum amount established for 1998 fora period of no more than 300 weeks from the date of injury of August 22, 1998 less the number of weeks plaintiff received compensation for his temporary total disability. N.C. Gen. Stat. § 97-30.
6. Plaintiff is entitled to receive all medical treatment for his compensable injury so long as said medical treatment should effectuate cure, give relief, or lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. For his temporary total disability, plaintiff is to receive temporary total disability compensation from August 22, 1998 until he began his employment with Image Concepts in September 1999 at the maximum compensation rate for 1998 which is $532.00 with appropriate credit to defendants for the $114,705.88 which plaintiff received in resolution of his injury grievance. Said amount shall be paid in a lump sum subject to an attorney's fee approved in Paragraph 4.
2. Subject to a reasonable attorney's fee herein approved, defendants shall pay plaintiff as of September 1999 for his temporary partial disability at the rate of two-thirds of the difference betweenplaintiff's average weekly wage before the injury and his post-injury wages that he earned working for Image Concepts, the sports marketing company in Chicago and for his personal appearances and autograph signingbut not more than the maximum amount established for 1998. The temporary partial disability compensation shall be paid for no more than 300 weeks which shall be reduced by the number of weeks that plaintiff is entitled to temporary total compensation and shall run from the date of injury, August 22, 1998. Said amount shall be paid in a lump sum subject to an attorney's fee approved in Paragraph 4.
3. Defendants shall pay for all medical expenses resulting from plaintiff's compensable injury by accident so long as such treatment should effectuate cure, give relief, or lessen plaintiff's period of disability.
4. A reasonable attorney's fee of twenty-five (25%) percent of compensation due plaintiff under Paragraphs 1 and 2 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five (25%) percent of lump sum due plaintiff under Paragraphs 1 and 2 of this AWARD shall be deducted from that sum and paid directly to plaintiff's counsel. In regards to future compensation, plaintiff's counsel shall be entitled to every fourth check.
5. Defendants shall pay the costs.
This the 19th day of August 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER